IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EUCLID MEDIA GROUP, d.b.a. CLEVELAND SCENE 1468 West 9th Street, #805 Cleveland, Ohio 44113<br><br>              Plaintiff,<br>  vs.<br><br>DOWNTOWN CLEVELAND ALLIANCE 1010 Euclid Avenue Cleveland, Ohio 44115<br><br>              Defendant. | CASE NO. _____<br><br>JUDGE _____ |
| **COMPLAINT WITH JURY DEMAND** ||

**I. NATURE OF THE ACTION**

1. This is a civil-rights action brought under 42 U.S.C. §§ 1983 and 1985(3) alleging violations of the First and Fourteenth Amendments of the U.S. Constitution arising out of Defendant's unauthorized removal of Plaintiff Euclid Media Group's *Cleveland Scene* newspaper boxes from downtown Cleveland streets. It also asserts a state-law cause of action for conversion.

2. Defendant Downtown Cleveland Alliance ("DCA") is a local non-profit organization that serves as an auxiliary wing of Cleveland's police and sanitation departments. From approximately

January 25 to February 10, 2017, DCA removed 26 of Plaintiff Euclid Media Group's duly licensed distribution boxes for the *Cleveland Scene* paper from downtown Cleveland's central business district, amounting to 40% of *Scene's* boxes in its densest circulation area. DCA retained possession of the *Scene* boxes for more than two weeks without notifying *Scene*, and admitted to having taken them only after a *Scene* representative contacted DCA on a tip from a witness who saw a DCA employee loading one of the boxes into a truck.

3. DCA has offered shifting, insufficient explanations for its removal of the boxes. First it cited safety concerns, claiming that the boxes were knocked over into city streets despite that each box is weighed down with cement blocks and weighs approximately 150 pounds. Later, DCA cited a City Ordinance allegedly requiring that newspaper boxes be "bolted down," but no such ordinance exists. Finally, DCA settled on blaming a rogue employee who decided that the boxes should be removed based on information he received at a conference in Cincinnati. None of these explanations justify DCA's removal of the boxes. And DCA has never explained why it did not notify *Scene* or Euclid Media Group of the removal until confronted by a *Scene* representative.

4. *Cleveland Scene* is one of the few (and increasingly dwindling) sources of quality investigative journalism in Northeast Ohio. DCA's removal of the *Scene* boxes came on the heels of critical *Scene* coverage of a controversial proposal for a nine-figure public subsidy to renovate Quicken Loans Arena. Two outspoken and financially self-interested supporters of this subsidy—Len Komoroski (Vice President of the Cleveland Cavaliers) and Dan Walsh (Board Chair of Destination Cleveland)—serve on DCA's 18-member Board of Directors, the rest of whom are comprised chiefly of finance and real-estate executives.

5. Regardless of DCA's motive for pulling *Scene's* journalism off the streets, the U.S. Constitution protects against any such infringement on speech absent a compelling justification that is plainly lacking here. As the U.S. Supreme Court has held, a party opposing an unjustified

restriction of speech "need adduce no evidence of an improper censorial motive." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991).

6.  The DCA, acting under color of law, cut *Cleveland Scene* off from its readers by stealing its property, and violated Euclid Media Group's and the public's constitutional rights in the process. DCA is liable for compensatory and punitive damages for this violation, and Euclid Media Group's attorneys' fees incurred in bringing this action.

## II. Parties

7.  Plaintiff Euclid Media Group is an Ohio corporation with its principal place of business in Cleveland, Ohio. Euclid Media Group owns and operates a number of "alternative-weekly" newspapers throughout the United States, including—in addition to *Cleveland Scene*—*Detroit Metro Times*, *Orlando Weekly*, *San Antonio Current*, and *St. Louis Riverfront Times*. In each of the last five years, *Scene* has earned awards for having published one of the top three feature stories, investigative-journalism pieces, or long-form news pieces from the Association of Alternative Newsmedia, an organization of more than 100 alternative newspapers from across the United States. *Scene's* journalism has exposed, among other things, information proving that three East Cleveland men were wrongly convicted of murder, leading to their exoneration and release in 2014 after they had spent decades in prison; an FBI affidavit containing detailed allegations that former Cleveland Mayor Michael White orchestrated a widespread kickback scheme on City contracts; and information showing that the abrupt resignation of the Cleveland Museum of Art's Director in 2013 was due to his extra-marital affair with a young staffer who committed suicide. Apart from these award-winning stories, which never would have seen the light of day if not for the work of *Scene's* journalists, the paper provides essential daily coverage of Cleveland government, politics, and culture, often tackling subjects that traditional media does not (whether for lack of capacity or inclination).

8. Defendant DCA is a local non-profit organization——founded in 2007 and funded mainly by downtown Cleveland property-owners and Cleveland taxpayers—that primarily serves as an auxiliary wing of Cleveland's police and sanitation departments. DCA works on agreements with the City of Cleveland by which it is authorized to enforce City Ordinances, maintains close two-way contact with the Cleveland Police and other City departments, and performs traditional governmental functions on the City's behalf to keep downtown streets clean and safe.

### III. JURISDICTION AND VENUE

9. Jurisdiction over federal claims under 42 U.S.C. §§ 1983, 1985, and 1988, which provide for attorney and expert fees for vindication of civil-rights claims, is asserted under 28 U.S.C. §§ 1331 and 1343.

10. Jurisdiction over state-law claims is asserted under 28 U.S.C. § 1367, which grants supplemental jurisdiction over claims that are part of the same case or controversy as claims over which the Court has original jurisdiction.

11. The Court has personal jurisdiction over defendants and venue is proper under 28 U.S.C. § 1391 because the relevant events took place with this Court's jurisdiction.

### IV. FACTUAL BACKGROUND

12. On Wednesday, January 25, 2017 at approximately 6:00 AM, *Scene's* Circulation Director Don Kriss received a phone call from one of the paper's deliverymen, who informed him that a newspaper box was missing. This deliveryman called Kriss several more times that morning to inform him that additional boxes were missing—ten in total by the end of that morning's route.

13. The next day, Mr. Kriss filed a report about the missing boxes with the Cleveland Police, a representative of whom suggested that someone might have stolen the boxes to sell them as scrap metal, and advised Mr. Kriss to visit some local scrap yards. That day, Mr. Kriss visited approximately ten local scrap yards and found no sign of the missing boxes.

14. The following Wednesday, February 1, 2017, the same deliveryman reported that eight more boxes were missing. The Wednesday after that, February 8, 2017, an additional eight boxes were reported missing, to make for 26 missing boxes in total, amounting to 40% of *Scene's* boxes in Cleveland's central business district, its densest circulation area. The next day, Kriss filed another police report.

15. On Friday, February 10, 2017, at 9:13 AM, *Scene* published a story about the missing boxes by Sam Allard, titled, "Scene's Distribution Boxes are Disappearing from Downtown." This story was posted on Scene's website, www.clevescene.com, and contained a request that anyone who "see[s] anything unusual, or know[s] anything about [the] missing boxes' whereabouts" contact Mr. Kriss.

16. Later that day, Scene's publisher Chris Keating received a phone call from a representative of a *Scene* advertiser who informed him that he witnessed a DCA representative loading a *Scene* box onto a truck. Kriss then immediately called DCA and left a message that was returned by DCA operations manager Brian Perkins. Perkins confirmed that DCA had the missing boxes "nicely stacked up" in their operations center on East 16th Street and St. Clair Avenue. Perkins told Kriss that DCA took the boxes because some of them were knocked over in the streets, so DCA decided to remove the rest of them based on safety concerns.

17. On that same afternoon, *Scene* reporter Sam Allard spoke with DCA's director of marketing and public relations, Heather Holmes, who told him that "Quite a few of [the boxes] were flipped don their side, in the middle of the sidewalk, tipping over into the street, and so [DCA staff] took them to our operations center for safekeeping." Holmes also told Allard—as reported in a February 10, 2017 story at *CleveScene.com* titled "Downtown Cleveland Alliance Stole All the Missing Scene Boxes, Citing Safety Concerns"—that DCA was in the midst of compiling a "very detailed report" about the boxes, but agreed that DCA was wrong not to inform Scene that it had taken them. "We'll

fall on our sword on that," Holmes said. "They should have called the moment they picked up the first one. At the time, they didn't know exactly who to reach out to."

18. All of the missing boxes were clearly marked with *Scene* branding, including *Scene's* web address, www.clevescene.com. *Scene's* web page and all *Scene* papers contain the paper's address and phone number, and every *Scene* article on the web contains a link to the author's email address, and every *Scene* paper contains each writer's email address.

19. The next day, *Cleveland.com* published a story about the missing boxes by Kaylee Remington, titled, "Cleveland Scene newspaper boxes removed by Downtown Cleveland Alliance." In this story, Remington reported that, "[DCA] spokeswoman Heather Holmes acknowledged Saturday that the organization's workers—known as ambassadors—removed the boxes, reporting that several had tipped over on sidewalks and into the streets." Remington continued to report that, "Holmes said that there is a city ordinance that requires that newspaper boxes be bolted down. However, the ordinance governing newspaper dispensers [Cleveland, OH Code of Ordinances § 680.05(b)] reads: 'Newspaper dispensing devices shall be anchored to the sidewalk by a method approved by the Director of Capital Projects and shall not be cabled or chained or otherwise attached to any object or building except to any other newspaper dispensing devices.'" Remington further reported that, "Holmes admitted that the Alliance workers made a misstep by removing the boxes" and that, "*Scene* should have been notified when the first box was taken." "There's no question that this wasn't the best route to go, no question at all," Holmes said, according to Remington. "They had no intention of violating anyone's person or property, and they take great pride in keeping downtown sidewalks clean and safe to provide the best pedestrian experience possible."

20. The following Wednesday, February 15, 2017, Euclid Media Group CEO Andrew Zelman and *Scene* editor Vince Grzegorek met with DCA President and CEO Joe Marinucci about the missing boxes. At this meeting, Marinucci told Zelman and Grzegorek that DCA operations

manager Brian Perkins caused the *Scene* boxes to be removed based on information that he received at a recent conference that he attended in Cincinnati, Ohio. It remains unclear as to why Perkins or anyone at DCA thought they had the authority to remove the boxes and retain them without notifying *Scene*.

21. The City of Cleveland authorizes *Scene* to distribute newspapers through its boxes by a permit issued under Cleveland Ordinance § 680.03. At all relevant times, *Scene* held a valid permit for its newspaper boxes.

22. Cleveland Ordinance § 680.06(a) provides that where "a newspaper dispensing device has been installed, placed, or maintained in violation of any of the provisions of this chapter or of any regulation promulgated by the Director [of Public Service] pursuant thereto, the Director shall issue an order to remedy the violation" to be served in person or by certified mail. This order "shall state the nature of the violation and provide that the owner has seven (7) calendar days after receipt of the order to remedy the violation or to file an appeal from the order with the Board of Zoning Appeals."

23. Cleveland Ordinance § 680.06(e) provides that "the Director [of Public Service] shall take immediate steps necessary to remove and impound any newspaper dispensing device upon the Director's determination that such device has been installed, placed or maintained in a manner which presents a clear and present danger to the public health or safety." In such cases, "notice of the impoundment including the reasons therefore" must be "served in person or by certified mail to the individual or other person identified in the permit application" "[w]ithin two (2) days" of any such impoundment.

24. Neither *Scene* nor Euclid Media Group received any notice that DCA had taken its boxes, as described in Cleveland Ordinance § 680.06 or otherwise.

25. DCA did not order the removal of any other newspaper boxes apart from the *Scene* boxes

and in many cases other newspaper boxes containing other publications—otherwise nearly identical in size, weight, and other physical qualities—were left standing in the very same areas from where *Scene* boxes had been removed.

26. DCA employs a fleet of "ambassadors" who patrol downtown streets dressed like police officers, to keep the streets clean and orderly. DCA's website touts that the ambassadors are "knowledgeable about local ordinances such as panhandling, loitering and solicitation" and "patrol downtown as a positive influence for safety, acting as the eyes and ears for police." The DCA website further states that,

> Ambassadors patrol specific districts, following a preset schedule and making regular stops by businesses on their route to gather and share security-related information and concerns. Ambassadors also carry two-way radios to reach one of our Peace Officers—off-duty Cleveland Police officers who can provide supplementary security. The Peace Officer on duty patrols in a marked Downtown Cleveland Alliance vehicle as a very visible presence to promote safety, and can issue citations or make arrests if necessary. They log about 2000 miles a month! The Peace Officer keeps in direct contact with the Cleveland Police Department at all times.

A regular citizen would not think twice about seeing a uniformed DCA employee loading newspaper boxes in a truck.

27. DCA's unauthorized removal of the *Scene* boxes came on the heels of critical *Scene* coverage of a controversial proposal for a discretionary nine-figure public subsidy—using both City and Cuyahoga County funds—to renovate Quicken Loans Arena. This included a critical piece by Sam Allard published on December 14, 2016 titled, "Everything You Need to Know About the Quicken Loans Arena Transformation." Two outspoken and financially self-interested supporters of this subsidy—Len Komoroski (Vice President of the Cleveland Cavaliers) and Dan Walsh (Board Chair of Destination Cleveland)—serve on DCA's 18-member Board of Directors. In addition to its coverage of the arena subsidy, *Scene* also published, in the weeks prior to January 25, 2017, a number of pieces critical of downtown Cleveland's business and political leadership. This included a number

of items critical of Cleveland Mayor Frank Jackson's controversial restrictions of public transit on Public Square, the Jackson administration's bungling of a report of unsafe runway conditions at Cleveland Hopkins Airport, the Mayor's intent to run for an unprecedented fourth term, and a drop in hotel occupancy rates attributed to "the massive building boom downtown," among other subjects. Jackson has been Mayor of Cleveland since 2006, thus, for the entirety of DCA's existence, throughout which his administration has worked closely with DCA to advance the interests of the downtown property owners who fund the DCA.

28. By February 15, 2017, DCA returned the taken boxes to *Scene*, but many of them were damaged, with glass broken, and the concrete weights and platforms removed from many of them.

29. Ohio law and the U.S. Constitution law entitle Euclid Media Group to recover compensatory damages for the harm caused by DCA's unauthorized taking of its boxes. Euclid Media Group is further entitled to punitive damages and attorneys' fees for DCA's tortious and unconstitutional conduct.

## V. CLAIMS

### Claim 1
### Unlawful Deprivation of Free Speech under
### the First and Fourteenth Amendments and 42 U.S.C. § 1983

30. Plaintiff incorporates the previous allegations by reference.

31. The Cleveland, Ohio sidewalks on which the *Cleveland Scene* newsboxes were placed are a public forum.

32. No party acting under color of law may restrict speech in a public forum unless the restrictive action furthers an important or substantial governmental interest, the governmental interest is unrelated to the suppression of free expression, and the incidental restriction on expression is no greater than is essential to further that interest.

33. In removing Plaintiffs' newspaper boxes from the Cleveland sidewalks, Defendant was

performing a public function delegated to it by the City of Cleveland, and acting as a willful participant in joint activity with the City of Cleveland or its agents, such activity having been entwined with governmental policies, and with government entwined in Defendants' management or control.

34. By removing Plaintiffs' newspaper boxes from the Cleveland sidewalks and retaining them for more than two weeks without notifying Plaintiffs, Defendant, acting under color of law, has deprived Plaintiff of its clearly established right to free speech under the First Amendment of the U.S. Constitution.

35. In removing Plaintiffs' newspaper boxes from the Cleveland sidewalks and retaining them for more than two weeks without notifying Plaintiffs, Defendant was carrying out a policy set by a DCA official with final decision-making authority, who ratified the unlawful taking of the boxes.

36. Defendant's removal of the *Scene* boxes and retention of them for more than two weeks without notifying Plaintiffs shows that Defendant failed to adequately train and supervise its employees.

37. Defendant restricted Plaintiff's distribution of *Cleveland Scene* because of its content and viewpoint.

38. Defendant's policies and practices, as implemented in removing Plaintiffs' newspaper boxes from the Cleveland sidewalks and retaining them for more than two weeks without notifying Plaintiffs, are impermissibly vague and ambiguous and give unfettered discretion to Defendant to suppress and/or discriminate against publications with disfavored viewpoints, which violates Plaintiff's clearly established right to free speech under the First and Fourteenth Amendments to the U.S. Constitution.

39. As a direct and proximate result of Defendant's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will

continue to suffer economic and non-economic damages for which Defendant is liable.

40.     Plaintiff is entitled to punitive damages and attorneys' fees based on Defendant's unlawful conduct.

### Claim 2
### Unlawful Deprivation of Property
### Fourteenth Amendment and 42 U.S.C. § 1983

41.     Plaintiff incorporates the previous allegations by reference.

42.     With purpose or intent, acting under color of law in his official capacity, Defendant unlawfully deprived Plaintiff of its newspaper boxes, which was its lawful property. A reasonable person or public official would not have deprived Plaintiff of its property in this manner, and Defendant did so without probable cause or reasonable need to do so. This deprivation of property was without due process and was objectively unreasonable under the Fourteenth Amendment. All of these actions caused damage to Plaintiff.

43.      Plaintiff's right to be free from deprivation of her property without due process is secured to her by the Fourteenth Amendment and was clearly established as of January 2017.

44.     As a direct and proximate result of Defendant's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will continue to suffer economic and non-economic damages for which Defendant is liable.

45.     Plaintiff is entitled to punitive damages and attorneys' fees based on Defendant's unlawful conduct.

### Claim 3
### Equal Protection Violation
### Fourteenth Amendment and 42 U.S.C. § 1983

46.     Plaintiff incorporates the previous allegations by reference.

47.     By removing Plaintiff's newspaper boxes from the Cleveland sidewalks and retaining them for more than two weeks without notifying Plaintiff, Defendant, acting under color of law, and

applying unwritten, vague, and arbitrary policies and practices to deprive Plaintiff of their constitutional rights, Defendant has treated Plaintiff differently than similarly situated individuals and organizations and has deprived Plaintiff of its clearly established right to equal protection under the law under the Fourteenth Amendment to the U.S. Constitution.

48. As a direct and proximate result of Defendant's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will continue to suffer economic and non-economic damages for which Defendant is liable.

49. Plaintiff is entitled to punitive damages and attorneys' fees based on Defendant's unlawful conduct.

### Claim 4
### Conversion

50. Plaintiff incorporates the previous allegations by reference.

51. At all relevant times, Plaintiff owned and had a right to possess its newspaper boxes, and to distribute its *Cleveland Scene* newspapers through them.

52. Defendant's actions in removing Plaintiff's newspaper boxes from the Cleveland sidewalks and retaining them for more than two weeks without notifying Plaintiff constitute a wrongful and unauthorized exercise of dominion over Plaintiff's property to the exclusion of Plaintiff's rights.

53. As a direct and proximate result of Defendant's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will continue to suffer economic and non-economic damages for which Defendant is liable.

54. Plaintiff is entitled to punitive damages and attorneys' fees based on Defendant's unlawful conduct.

### VI.
### PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A. Declare that Defendant's acts and conduct constitute violations of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. §§ 1983.

B. Judgment in Plaintiff's favor as to all claims for relief.

C. General and special damages in excess of $25,000 to compensate for the injuries Plaintiff sustained due to Defendants' conduct including economic and non-economic damages for medical costs, pain, suffering, humiliation, and emotional distress.

D. Punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorneys' fees and costs incurred in maintaining this action.

E. All other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

## VII.
### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM, LLC

*/s/ Peter Pattakos*
Subodh Chandra (0069233)
Peter Pattakos (0082884)
Patrick Haney (0092333)
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Peter.Pattakos@ChandraLaw.com
Patrick.Haney@ChandraLaw.com

*Attorneys for Plaintiff Euclid Media Group*